UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| BARRY YOUNG,<br>    Plaintiff,<br><br>v.<br><br>LOCAL 1201, FIREMEN & OILERS UNION,<br>    Defendant. | CIVIL ACTION<br><br>No. 07-3576 |

Pollak, J.                         September 25, 2009

## OPINION

  Plaintiff Barry Young, a member of Local 1201, Firemen & Oilers Union ("Local 1201" or "the union") and a former employee of the School District of Philadelphia ("the district"), has sued Local 1201 on the basis of actions it took with respect to plaintiff's employment with the district. Because plaintiff is proceeding *pro se*, the court construes Young's complaint liberally and holds it "to 'less stringent standards than formal pleadings drafted by lawyers.'" *Estelle v. Gamble*, 429 U.S. 97, 106 (1976) (quoting *Haines v. Kerner*, 404 U.S. 519, 520-21 (1972)). Therefore, the court will interpret plaintiff's complaint as alleging both (1) unlawful discrimination and retaliation based on race in violation of Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2003(e) *et seq.*, and the Pennsylvania Human Relations Act, 43 Pa. Stat. § 951 *et seq.* ("PHRA"), and (2) a defamation claim arising under Pennsylvania law. Since the PHRA is interpreted and

applied identically to Title VII, this court's disposition of the Title VII claims will govern the PHRA claims. *E.g.*, *Ward v. Ridley Sch. Dist.*, 940 F. Supp. 810, 811 n.2 (E.D. Pa. 1996).

This court has jurisdiction over plaintiff's federal claims pursuant to 28 U.S.C. § 1331 and has supplemental jurisdiction over the defamation claim, which arises under Pennsylvania law, pursuant to 28 U.S.C. § 1367(a). The case is now before this court on Local 1201's motion for summary judgment (docket no. 21). For the reasons given below, the court will grant defendant's motion.

## I.

Plaintiff's various claims implicate the history of his employment with the district. The court therefore reviews that history at some length, viewing the facts in the light most favorable to plaintiff, the non-moving party. *See Biliski v. Red Clay Consol. Sch. Dist. Bd. of Educ.*, 574 F.3d 214, 218 (3d Cir. 2009).

Plaintiff started work with the district as a Building Engineer Trainee ("BET") on December 9, 2002, Def.'s Ex. 4, at 24, and was subsequently promoted to the position of Building Engineer I, *id.* at 26-27. While employed as a BET and Building Engineer, plaintiff was a member of Local 1201. The relationship between the union and the district is governed by a collective bargaining agreement ("CBA"), which includes a Policy on Substance Abuse by Members of Local 1201 National Conference of Firemen and Oilers. *See* Def.'s Ex. 5.

Plaintiff's employment with the school district began inauspiciously. Two weeks

after being hired, plaintiff was accused of stealing. *See* Def.'s Ex. 4, at 194. A hearing was held on January 23, 2003, to determine whether or not he should be discharged. *Id.* Knowing that union president Michael McGinley – who is white – would be attending the hearing, Young "provided [McGinley] with information of [Young's] work history." *Id.* McGinley, however, failed to bring the documents to the hearing. *Id.* at 195. McGinley also had a half-hour closed-door meeting with Young's supervisor, Timothy McCollum, who had recommended that Young be discharged. *Id.* at 195, 197. Young was not fired as a result of the meeting, though Young believes that a subsequent telephone call from his state representative saved his job. *Id.* at 197.

Plaintiff suffers from depression, an ailment that has caused him to "self-medicat[e]" with alcohol, cocaine, and crack. *Id.* at 42. Hoping that treatment for depression would obviate the need to self-medicate, plaintiff spoke to Ron Ellis, the union's substance abuse program representative. *See* Def.'s Ex. 1, at 1; Def.'s Ex. 4, at 49, 81. Ellis is African-American. Def.'s Ex. 1, at 1. At Ellis's insistence, Young attended a rehabilitation program in Florida. *Id.* at 49. Plaintiff attended the rehabilitation center, which diagnosed him with cocaine and alcohol dependence, from January 10, 2004 until his discharge on February 13, 2004. *Id.* at 52; Def.'s Ex. 11, at 2. Young subsequently attended outpatient rehabilitation in Pennsylvania. Def.'s Ex. 4, at 52; Def.'s Ex. 11, at 4. After reporting back to the district on March 16, 2004, plaintiff signed an "Employee Notice of Self-Referral" on March 16. Def.'s Ex. 4, at 92; Def.'s Ex. 12.

On June 22, 2004, even though Young was not using cocaine or crack, he contacted Ellis, stating that he was drinking and depressed, Def.'s Ex. 4, at 54-55, and "begg[ing]" Ellis to send him to rehabilitation, either with a psychiatrist or in an after-work program, *id.* at 102. Instead, plaintiff was again required by Ellis to attend the Florida rehabilitation center. *Id.* at 54-55. Ellis said that the union would "wash [its] hands of" Young if Young did not go back to rehabilitation in Florida. *Id.* at 56. Plaintiff's second stint in Florida lasted for about thirty days, beginning on June 22, 2004; after leaving Florida, Young again attended outpatient rehabilitation in Pennsylvania. *Id.* at 57-58. Young never signed a notice of self-referral regarding his second trip to Florida. Pl.'s Resp. at 4.

The district coded plaintiff as taking unexcused absences for two days each time he entered rehabilitation. In April 2004, the district held a hearing on the first two of these absences; Ellis and Ernest Bennett, the African-American vice president of Local 1201, represented plaintiff at the hearing. Def.'s Ex. 4, at 75. The district official present stated that, if Ellis called him the next day, the absences would be removed, and Young urged Ellis to telephone the district, but Ellis never did so. *Id.* at 75-77. Plaintiff received a disciplinary letter regarding the later pair of unexcused absences. *Id.* at 161. Plaintiff thereupon approached both Ellis and Bennett for assistance in having the absences re-coded, but they failed to deal with the issue. *See id.* at 72, 237-38.

Plaintiff passed a return-to-duty drug test on June 9, 2005, following his second stay in rehabilitation, and became eligible to return to work shortly thereafter. *See* Def.'s

Ex. 18. Following his return to duty, plaintiff was subject to follow-up drug tests; the test taken on October 17, 2005 was positive for illegal drugs. Def.'s Ex. 19. On October 21, plaintiff was called to the office of Carol Kenney, a school district official. While there, he was informed of the positive test results and was given a memorandum explaining that a termination hearing was scheduled for October 25, 2005. Def.'s Ex. 4, at 163-64, 171-72. Ron Ellis also attended the meeting, and, shortly after he arrived, he stated loudly that plaintiff's test was positive and that Young was "high" at that very moment and would be fired. *Id.* at 167. At some point during the meeting, Ellis repeated to Young that Young "was high" and would be fired. *Id.* at 172. During the meeting, plaintiff also requested that his split sample be tested, and Ellis "reiterated that request." *Id.* at 173. The split sample was never tested.[1] Def.'s Ex. 21. After the meeting on October 21, Young called McGinley to express his anger at Ellis and to request that he be represented by someone other than Ellis. Def.'s Ex. 4, at 174. McGinley refused this request. *Id.*

On October 25, 2005, while plaintiff was en route to his termination hearing, Ellis told him that he would be fired if he did not resign and "coerced" plaintiff to sign a resignation letter. *Id.* at 175. Ellis told Young that the split-sample test had been

---

[1] The parties have not clearly defined the term "split-sample test." While the precise meaning of the term is not material to the outcome of this case, the court assumes that it refers to Section 9.4 of the PSA, which mandates that of the 45 milliliters of urine contained in a "single use collection container," "[t]he primary test specimen shall contain at least 30 ml. of urine," and "[a]t least 15 ml. shall be used for the split sample specimen." Def.'s Ex. D, at 134. The court therefore understands plaintiff's request to be a request that the 15 milliliter secondary specimen be tested.

completed and returned "positive for cocaine" and informed him that, if he signed the resignation letter, the union "would assist [Young] in finding employment" and "in any other medical attention or help that [he] needed." *Id.* at 176-77. Ellis later refused to allow Young to withdraw his resignation letter. *Id.* at 178.

On March 28, 2006, plaintiff filed a complaint with the Pennsylvania Human Relations Commission ("PHRC"), alleging that the union's conduct at the time of plaintiff's resignation was discriminatory. Def.'s Ex. 3. On May 14, 2007, the PHRC notified plaintiff that it was "unable to conclude that the information obtained establishes violations of the" Pennsylvania Human Relations Act ("PHRA"). Pl.'s Add'l Resp., at 2. Appended to this letter was a notice that plaintiff had two years in which to "file a complaint in the court of common pleas . . . based on the right to freedom from discrimination granted by the [PHRA]." *Id.* at 3.

## II.

Summary judgment should be granted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact exists where the jury could reasonably find for the non-moving party, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), and a dispute over facts is material where it could affect the outcome of the case, *Belitskus v. Pizzingrilli*, 343 F.3d 632, 639 (3d Cir. 2003). "In considering the evidence, the court should draw all reasonable inferences against the

moving party." *El v. SEPTA*, 479 F.3d 232, 238 (3d Cir. 2007).

A party seeking summary judgment carries the initial burden of informing the district court of the basis for its motion and identifying the portions of the record that show that there is no genuine issue of material fact. *Celotex v. Catrett*, 477 U.S. 317, 322 (1986); *Belitskus*, 343 F.3d at 639. Where the non-moving party bears the burden of proof, the moving party must show that the non-moving party cannot support its case with the evidence in the record. *Celotex*, 477 U.S. at 325. In rebuttal, the non-moving party must then identify facts that create a genuine issue of dispute for trial. Fed. R. Civ. P. 56(e); *Hampton v. Borough of Tinton Falls Police Dept.*, 98 F.3d 107, 112 (3d Cir. 1996). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . . The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255.

### III.

### A.

In order to prove a prima facie case that the union violated Title VII, "plaintiff must prove that: (1) the [union] committed a violation of the CBA with respect to the plaintiff; (2) . . . the Union permitted that breach to go unrepaired, thus breaching its own duty of fair representation; and (3) . . . there was some indication that the Union's actions were motivated by some discriminatory animus." *Yon v. SEPTA*, Nos. 01-5231 & 01-5232, 2003 WL 22597614, at *16 (E.D. Pa. Nov. 4, 2003) (citing *Bugg v. Int'l Union of*

*Allied Workers of Am.*, 674 F.2d 595, 598 n.5 (7th Cir. 1982) and *Bell v. Glass, Molders, Pottery, Plastics, and Allied Workers Union Local No. 246*, No. 00-1693, 2002 WL 32107218 (W.D. Pa. Aug. 29, 2002)). "The deliberate choice not to process grievances" can, under certain circumstances, violate Title VII. *Goodman v. Lukens Steel Co.*, 777 F.2d 113, 127 (3d Cir. 1985). To show a breach of the duty of fair representation, however, an employee must show more than that the union refused to represent the employee, "even if the [employee's] claim was meritorious." *Findley v. Jones Motor Freight*, 639 F.2d 953, 958 (3d Cir. 1981). Rather, "[p]roof of arbitrary or bad faith union conduct in deciding not to proceed with the grievance is necessary to establish lack of . . . fair representation." *Id.* "To demonstrate bad faith, the plaintiff must show that the union had hostility toward plaintiff or the plaintiff's class and that the hostility negatively affected the union's representation of the plaintiff." *Boyer v. Johnson Matthey, Inc.*, No. 02-cv-8382, 2005 WL 35893, at *9 (E.D. Pa. Jan. 6, 2005) (citing *Bell*, 2002 WL 32107218, at *4).

The gravamen of plaintiff's discrimination claim is that both (1) Local 1201's failure to represent him after his failed drug test in October 2005 and (2) its refusal to have anyone but Ron Ellis represent him amounted to illicit racial discrimination. Plaintiffs claim is supported by the undisputed facts that (1) the union concurred in the district's view that Young was subject to termination, *see* Def.'s Mem. at 15, (2) the union suggested that Young should resign instead of facing an imminent termination hearing, *see id.*, and (3) when Ron Ellis arrived for a meeting with plaintiff and Kenney

8

after the failed drug test, he claimed that plaintiff was "high" at that very moment, *see id.* at 8.  The court assumes that Ellis's actions toward Young sufficiently demonstrate subjective hostility toward the plaintiff and further assumes that the district and the union therefore violated the terms of the CBA in subjecting plaintiff to an automatic discharge.

Nevertheless, plaintiff has not established a prima facie case, because there is no "indication that the Union's actions were motivated by some discriminatory animus." *Yon*, 2003 WL 22597614, at *16.  The court notes that while Young's history with Ron Ellis was contentious, plaintiff does *not* believe that Ellis "sent [plaintiff] to Florida twice because of [his] race" or "as a form of discrimination."  Def.'s Ex. 4, at 56.  When asked if he believed that Ellis's actions in October 2005 were motivated by his race, plaintiff answered that he "did not know" and could not point to "any one person" in the union who racially discriminated against him.  *Id.* at 178.

Plaintiff instead argues that discrimination may be inferred, because he was treated differently from two white building engineers (denominated "Employee A" and "Employee B") who failed one drug test each and were not forced to resign.  *See id.* at 179-80, 198; Pl.'s Resp. at 3.  However, the union notes that white "Employee C" self-referred twice, subsequently failed a drug test, and then, pending a termination hearing, signed the same resignation letter that plaintiff signed.  Def.'s Mem. at 16-17.  As explained in this court's concurrently-issued opinion in *Young v. School District of Philadelphia*, No. 06-4485, Employee C is the proper comparator because, under the definition of "self-referral" included in the CBA's Policy on Substance Abuse, both

9

plaintiff and Employee C had self-referred twice. As further noted in that opinion, the district treated plaintiff and Employee C entirely consistently; the union's treatment of the two employees – both of whom signed resignation letters before being discharged – was also substantively symmetrical. Thus, assuming *arguendo* that the union improperly failed to represent *both* plaintiff and Employee C, there is no evidence in the record to suggest that its failure was racially motivated.

The court notes that plaintiff's claim for discriminatory breach of the duty of fair representation may also refer either to (1) Michael McGinley's failure to bring certain documents with him to plaintiff's 2003 termination hearing, (2) Ron Ellis's failure to follow up with the school district regarding plaintiff's unexcused absences, (3) Ellis's other conduct towards Young, and/or (4) the union's failure to ensure that a split-sample test was taken.

A claim based on the 2003 hearing would fail because there is no evidence that, in October 2003, the union held "subjective hostility" towards the plaintiff *or* that any such hostility "adversely affected the union's representation." *Bell*, 2002 WL 32107218. Although plaintiff believes that McGinley conspired with Timothy McCollum, plaintiff's then supervisor, to terminate plaintiff's employment on the basis of plaintiff's race, Young admitted that he has no evidence of any such conspiracy. *See* Def.'s Ex. 4, at 199-201. Plaintiff also states that, at the time of the hearing, he was not aware that McGinley was discriminating against him because of his race. *Id.* at 195. Young's belief concerning a conspiracy in 2003 is thus too "speculative" to survive summary judgment. *Lexington*

*Ins. Co. v. W. Pa. Hosp.*, 423 F.3d 318, 333 (3d Cir. 2005).  Further, even if outside telephone calls were the driving force behind the decision, plaintiff was not terminated after the 2003 hearing.  Absent any contrary evidence, the court cannot conclude that a factfinder would have a reasonable basis for finding that (1) McGinley's failure to bring certain documents to the hearing or his decision to hold a closed-door meeting with McCollum adversely affected the union's representation of Young, and (2) McGinley's actions were arbitrary or taken in bad faith.  McGinley's conduct was therefore within the broad range of discretion afforded to unions acting on behalf of their members.  *See Boyer*, 2005 WL 35893, at *9.

A claim based on either Ellis's failure to deal with plaintiff's unexcused absences or his aggressive conduct toward Young would fail because there is no evidence of discriminatory animus.  Plaintiff stated at his deposition that Ellis did not fail to deal with the absences "in order to discriminate against [Young] because of [his] race," Def.'s Ex. 4, at 74, and that he "[didn't] know" if the collective failure of Ellis and Bennett to have the absences removed was a result of his race, *id.* at 77.  There is no evidence, however, that either Ellis or Bennett failed to do so because of racial animosity.

Finally, although it is uncontested that plaintiff requested a split-sample drug test in October 2005 and that Ron Ellis falsely told him that such a test had been performed, neither Ellis's statement nor his concomitant failure to ensure the completion of the split-sample test rises to the level of a breach of fair representation.  Once again, the problem is that there is no evidence in the record to support plaintiff's speculative belief that "what

happened to [him] was . . . a result of discrimination." Def.'s Ex. 4, at 178; *see, e.g.*, *Trap Rock Indus., Inc. v. Local 825*, 982 F.2d 884, 890 (3d Cir. 1992) (noting that a "non-moving party may not rest upon mere allegations, general denials or . . . vague statements") (internal quotation omitted).

For these reasons, the court will grant defendant's motion as to plaintiff's breach of fair representation claim.

**B.**

Young's second claim is that Local 1201 retaliated against him "for continuously demanding representation against [his] former employer." Compl. at 1. Specifically, plaintiff alleges that the union "sid[ed] with [the district], conspir[ed] to misrepresent [the CBA] and coerce[d him] to sign a pretyped letter of resignation prepared by union officials." Compl. at 1. The court construes this claim as one for retaliation in violation of Title VII and the PHRA. Thus, to "establish a prima facie case of retaliation . . . plaintiff must show that (1) [he] engaged in a protected activity under Title VII; (2) the [defendant] took an adverse action against [him]; and (3) there was a causal connection between the [plaintiff's] participation in the protected activity and the adverse employment action." *Wilkerson v. New Media Tech. Charter Sch. Inc.*, 522 F.3d 315, 320 (3d Cir. 2008). Summary judgment for the union is proper if the plaintiff cannot "raise a genuine issue of material fact as to . . . one or more elements of the plaintiff's prima facie case." *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 501 (3d Cir. 1997).

Defendant argues that Young has not shown either an adverse employment action

or a causal connection.  However, the court will grant defendant's motion on the separate ground that plaintiff did not engage in any activity protected by Title VII.[2]  "With respect to 'protected activity,' the anti-retaliation provision of Title VII protects those who participate in certain Title VII proceedings (the 'participation clause') and those who oppose discrimination made unlawful by Title VII (the 'opposition clause')."  *Moore v. City of Phila.*, 461 F.3d 331, 341 (3d Cir. 2006).  Under the opposition clause, a plaintiff's complaints about unfair treatment must "specifically complain" that he suffered the inequitable treatment because of reasons that violate Title VII.  *Barber v. CSX Distrib. Servs.*, 68 F.3d 694, 701 (3d Cir. 1995).  Similarly, under the participation clause, the formal complaint giving rise to the Title VII proceeding must "allege prohibited grounds."  *Slagle v. County of Clarion*, 435 F.3d 262, 267 (3d Cir. 2006).  Here, although Young repeatedly requested representation from the union with respect to the absences marked unexcused by the district, Def.'s Ex. 4, at 72, 74-76, 323-27, plaintiff's motivation for doing so was that he "knew" that he "would be terminated" if too many unexcused absences accrued on his employment record, *id.* at 326.  Indeed, plaintiff did not ever tell the union that he believed the district coded his absences as unexcused because of his race.  *See id.* at 226.  Accordingly, his activity was not protected by Title VII, and summary judgment will be granted to the defendant on plaintiff's retaliation claim.

---

[2]  Because summary judgment is warranted on this ground, the court will not consider defendant's argument that plaintiff did not exhaust his administrative remedies.

## C.

Finally, plaintiff alleges that he was defamed as a matter of Pennsylvania law by both (1) Ellis's comments that Young was high and drunk at the October 21, 2005 meeting in Kenney's office and (2) the union's June 6, 2006 position statement to the Pennsylvania Human Rights Commission ("PHRC"). *See* Def.'s Ex. 4, at 187-92. As the union correctly notes, Pennsylvania has a one-year limitations period for defamation claims, 42 Pa. Cons. Stat. § 5523, and plaintiff did not file suit until August 30, 2007, *see* Compl. at 1, more than one year after both October 5, 2005 and June 6, 2006. Thus, absent the operation of an equitable tolling doctrine, plaintiff's defamation claim is time-barred.

Plaintiff argues that his defamation claim remains timely because he "was given two years to file suit in court by [the] PHRC." Pl.'s Add'l Resp., at 1. The "Notice of Complainant's Rights" that plaintiff received from the PHRC does state that "[i]f you wish to file a complaint in the court of common pleas, the complaint must be filed within two (2) years after the date of the notice from the commission closing the complaint." *Id.* at 3. Plaintiff received that notice on May 14, 2007. *See id.* at 2. Essentially, then, plaintiff argues that he is entitled to equitable tolling of the limitations period because the PHRC notice misled him into believing that he could file suit against Local 1201 until May 14, 2009. But this argument is not persuasive. Immediately before the language quoted above, the PHRC notice states that "you have the right, upon the dismissal of your case, to file a complaint in the courts of common pleas of the Commonwealth *based on*

14

*the right to freedom from discrimination granted by the Act.* Section 962(c)(1)." *Id.* (emphasis added). The notice therefore makes clear that the two-year period for suit concerns claims based on alleged violations of the PHRA's anti-discrimination provisions – not any and all claims potentially cognizable in plaintiff's complaint against Local 1201.

Moreover, "[a]lthough the Pennsylvania Supreme Court has not yet spoken on this issue, federal district courts have consistently extended the logic of *Johnson v. Railway Express Agency*, 421 U.S. 454, 465-66 (1975), to hold that the pendency of a discrimination charge before the PHRC . . . does not toll the statute of limitations for related Pennsylvania state tort claims." *Burlingame v. Pretium Packaging,* No. 05-cv-2469, 2006 WL 2302375, at *5 (M.D. Pa. Aug. 6, 2006); *see also, e.g.*, *Mincin v. Shaw Packing Co.*, 989 F. Supp. 710, 718-20 (W.D. Pa. 1997). Under *Johnson*, a plaintiff must "take the minimal steps necessary to preserve each [of his] claim[s] independently." 421 U.S. at 466. Thus, although judicial action may equitably toll a statute of limitations under certain circumstances, *see, e.g.*, *Verrichia v. Dep't of Revenue*, 639 A.2d 947, 964 n.13 (Pa. Commw. Ct. 1994), plaintiff is not entitled to automatic tolling of the limitations period governing his state-law defamation claim against Local 1201 for the time his administrative complaint was pending before the PHRA.

Finally, equitable tolling does not otherwise apply to plaintiff's defamation claims. Pennsylvania law recognizes equitable tolling where either (1) the discovery rule applies or (2) the defendant is estopped from relying on the limitations period. *See Wilson v. El-*

15

*Daief*, 964 A.2d 354, 359 (Pa. 2009); *Molineux v. Reed*, 532 A.2d 792, 794 (Pa. 1987). The discovery rule does not apply to plaintiff's claims, because he would have "learn[ed] that [he] ha[d] an injury and its cause" at the moment the allegedly defamatory statements were published. *Wilson*, 964 A.2d at 359. Estoppel is similarly inapplicable, because there is no indication that "the defendant cause[d] the plaintiff to relax his vigilance or deviate from his right of inquiry," "through fraud or concealment." *Molineux*, 532 A.2d at 794 (internal quotation marks omitted).[3] Accordingly, defendants are entitled to summary judgment on plaintiff's defamation claims.

## IV.

For the foregoing reasons, defendant's motion for summary judgment will be granted. An appropriate order accompanies this opinion.

---

[3] The Pennsylvania courts have been wary of extending equitable tolling doctrines to other circumstances, *see Mosley v. Settles*, 779 A.2d 1208 (Pa. Super. Ct. 2001), but even if Pennsylvania law were to allow equitable tolling "when the plaintiff 'in some extraordinary way' was prevented from asserting [his] rights," *Seitzinger v. Reading Hosp. & Med. Ctr.*, 165 F.3d 236, 240 (3d Cir. 1999), that extension would not apply here, because nothing prevented plaintiff from filing a defamation suit prior to August 2007.